Michael Francis Fay JONES, a minor, by his father and next friend, Arthur Edgar Jones, Jr., and Arthur Edgar Jones, Jr., Appellants,

v.

UNITED STATES of America, Appellee.

No. 7246.

United States Court of Appeals Fourth Circuit.

Argued Nov. 15, 1956.

Decided Jan. 10, 1957.

---

Russell Morton Brown, Washington, D. C., and Richard W. Whitlock, Balti-more, Md. (J. Howard McGrath, and Mc-Grath & Brown, Washington, D. C., on brief), for appellants.

John H. Somerville, Asst. U. S. Atty., Baltimore, Md. (Walter E. Black, Jr., U. S. Atty., Baltimore, Md., on brief), for appellee.

Before SOPER and SOBELOFF, Circuit Judges, and HOFFMAN, District Judge.

### HOFFMAN, District Judge.

On this appeal from a judgment in favor of the defendant in the United States District Court for the District of Maryland, appellants urge that the lower court has improperly interpreted the principles of law applicable to the facts of the case. The action is under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), and the able opinion of the learned District Judge is reported below under the style of Jones v. City of Aberdeen, Maryland, D.C., 138 F.Supp. 727.

During the year 1943 the Federal Public Housing Administration saw fit to erect a housing project, known as Baldwin Manor, at Aberdeen, Maryland, the essential purpose of which was to provide housing for employees of the Aberdeen Proving Grounds. The authorizing legislation was the Lanham Act, 42 U.S.C.A. §§ 1521–1574. Following the termination of World War II the demand for such housing diminished, but the subsequent Korean conflict once again brought an increased population into the area. The Baldwin Manor project was constructed on leased land adjoining the main line of the Pennsylvania Railroad which, at the point involved herein, consisted of three sets of tracks over which approximately 117 trains passed during a twenty-four hour period, many being rapidly moving express trains.

In March, 1952, Arthur Edgar Jones, Jr., an employee at the Aberdeen Proving Grounds, applied for and was assigned living quarters for himself, his wife, and their infant son, Michael, in

Baldwin Manor. On October 9, 1952, at approximately nine o'clock a. m., young Michael, then 23 months old, was taken by his mother to a neighbor's apartment several doors away where the mother wished to use the telephone. The little boy requested permission to see some new-born puppies who were next door and his mother accordingly let him out of the back door. After completing her telephone call in approximately three to five minutes, the mother left to find her son but he could not be located. A general search of the area ensued and the child was ultimately found by a railroad policeman, at a point estimated at 550 feet from the family housing unit, lying on the railroad right-of-way in close proximity to the tracks with one leg completely severed and the other so badly injured that amputation was required. Immediate hospitalization and excellent medical attention saved the child's life. While there were no eye witnesses to the tragic accident, it is obvious that the little boy was struck by a train.

Appellants' theory upon which they seek to justify a recovery is that when the Government erected the housing project adjacent to the main line of the railroad, it knew, or in the exercise of reasonable care should have known, that there was serious danger to small children of its tenants, and standards of reasonable care required some provision to protect these children. The District Judge held that the Jones family had voluntarily assumed the risk in renting quarters on the project, the nature and surroundings of which were open and obvious; that the child was a mere licensee in going across the open field a distance of from 390 to 550 feet to the railroad tracks, and the Government owed him no duty to make the premises reasonably safe; and, finally, that insufficient supervision on the part of the mother constituted contributory negligence imputable to the child.

While the entire housing project consists of numerous family units of varying capacities and there are several improved roadways along and between the living quarters, the housing unit occupied by appellants was at the end of an arc comprising five separate buildings on the side of a roadway nearest the railroad. As heretofore suggested, the distance between the railroad tracks and the closest point of the unit occupied by appellants was approximately 390 feet. About the same distance existed between the tracks and the unit on the opposite end of the arc. In the large open space formed by the arc comprising the five housing units and the approximate 390 feet separating the ends of the arc and the railroad tracks, nothing was erected and maintained by the Housing Administration and no portion of same had been designated as a playground, although it is freely conceded that Little League baseball teams used the area with permission of the General Housing Manager during the summer of 1952 and, in the fall of that year, a high school football team used the field for practice purposes. Additionally, the Housing Manager had knowledge of the general use of the area by children, including the fact that children sometimes crossed the railroad tracks. Several footpaths are indicated through the woods, underbrush and over the ditch separating the tracks from the open area. It is rather apparent that adults and children used these paths as a shortcut to the business and commercial area on the opposite side of the railroad tracks.

We are urged to accord special emphasis to the provisions of the Lanham Act in the light of the Maryland decisions relied upon by the appellee and so ably discussed in the opinion of the lower court. It is true that the Act, 42 U.S.C.A. § 1548, states that the Administrator shall establish "reasonable standards of safety, convenience, and health" in the housing projects. A Housing Manager's Manual also contains provisions requiring the "correction of any condition hazardous to health or safety". But our attention has been directed to no authority sup-

porting the view that it is the duty of the Government, or any other landlord, to guard against conditions which exist on adjoining property. Nor does the evidence point to any reasonably established standard of care in any housing project wherein potentially dangerous conditions existing on adjoining properties have been separated by barricades of one type or another. The language of the Lanham Act referring to the establishment of reasonable standards of safety, convenience, and health, as well as the directives in the Manual specifying the correction of conditions hazardous to health and safety cannot, in our opinion, be extended to provide against tragic accidents occurring on other properties. To hold otherwise would make it incumbent upon landlords to erect fences around all projects, as it is just as reasonable to assume that a small child would dart out into a main highway adjacent to a project and sustain comparable injuries or death. Indeed, any holding tending to support appellants' view of the case would make the Government an insurer of the safety of small children. We are, therefore, of the opinion that the appellee is guilty of no actionable negligence.

 The law of Maryland clearly points to the application of the assumption of risk doctrine. As we have indicated, the Lanham Act neither increases nor decreases the normal responsibilities of landlord. The danger here was open, obvious, natural, and common to all. In such a situation, the primary duty to inform, advise and protect a child of tender years must rest upon the parents or others in *loco parentis*. To require a landlord to erect a fence or barricade alongside a railroad track or highway, in order that adventurous children may not enter, would impose such a burden that it may unduly interfere with the lawful use of the property. In the absence of the application of the doctrine of "attractive nuisance", a rule which is not followed in Maryland, there is no plausible theory upon which appellants may require the appellee to respond in damages.

Appellants rely upon State of Maryland, for Use of Pumphrey, v. Manor Real Estate & Trust Co., 4 Cir., 176 F.2d 414, wherein this Court reversed the action of the District Court in dismissing a complaint against the United States of America predicated upon a factual situation in which a tenant died of endemic typhus, a disease transmitted by means of the bite of a flea from an infected rat, when bitten in the basement of the leased premises over which the landlord maintained control. The Court found that the negligence of the project managers consisted of providing inadequate janitor service and taking inadequate steps to eliminate the rats in the cellars. It is true that the Court held, under the facts of that case, that the tenants were entitled to exercise the right of occupancy conferred by the lease and to demand that the landlord perform the duty of keeping the reserved portion (the basement) of the premises in safe condition for their use. The holding in the foregoing case that the assumption of risk doctrine was inapplicable is not to be construed as carrying with it an obligation to protect from dangers on adjacent properties over which the landlord maintains no control. Moreover, there was no evidence in the aforementioned case that the tenant was aware of the danger of infection from the rat infested premises.

The case of McCarthy v. New York, N. H. & H. R. Co., 2 Cir., 240 F. 602, is very much in point. There, a six year old child resided with his father in a house rented from the defendant railroad on premises abutting the railroad's right-of-way. The child strayed upon the tracks and was killed by defendant's train. It will be noted that the tracks were within 25 to 30 feet of the back porch of the leased premises. The Court held that the defendant, as landlord, owed no legal duty to its tenant, or the decedent child as a member of the tenant's family, to erect a fence, and that

the landlord fulfilled its obligation when it surrendered the premises with an open and obvious danger present on the adjoining property not thereby leased.

This is not a case in which the defendant has created any hidden defect or danger by its own act, or has been guilty of omission in failing to remedy such hidden danger on its own property. Such a state of facts may well give rise to an issue in determining the duty to maintain premises, owned by it and used in common by different tenants, in a reasonably safe condition.

The Maryland authorities affirmatively support appellee's contention that a landlord owes no greater duty to a minor child than to the adult tenant with regard to open and obvious dangers. Smith v. State, Use of Walsh, 92 Md. 518, 48 A. 92, 51 L.R.A. 772. To hold otherwise would, in substance, impose upon a landlord the duty of making the premises, and adjoining premises, child-proof. Nor is there any merit to appellants' insistence that the law of Maryland is not applicable by reason of the provisions of the Lanham Act which, in our opinion, neither increases nor decreases the responsibilities of the Government as contrasted with those of any other Maryland landlord.

For the reasons herein stated it is unnecessary for us to discuss the interesting questions relating to the lower court's ruling that the child was a mere licensee, and that the parents were guilty of negligence which was imputable to the child under the law of Maryland as it existed at the time of this accident[1]. Were we to conclude this latter question as an issue of fact, we would not agree with the District Judge, but we see no need to prolong this discussion as to this point.

The judgment of the District Court is accordingly

Affirmed.

[1]. The Maryland statute, Acts of 1956, ch. 78, Annotated Code of Maryland, 1956 Supp., Art. 75, § 3A, has changed the law to the end that negligence is no longer imputed by reason of parenthood.